JS-6

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-05301-RGK (PJWx) | Date | March 11, 2015 |
|---|---|---|---|
| Title | *LAI v. USB-IMPLEMENTERS FORUM, INC. et al.* | | |

| Present: The Honorable | R. GARY KLAUSNER, U.S. DISTRICT JUDGE |
|---|---|

| Sharon L. Williams (Not Present) | Not Reported | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:** (IN CHAMBERS) Order re: Motions to Dismiss First Amended Complaint (DE 40, 41)

## I.    INTRODUCTION

On July 29, 2014, plaintiff Joseph Lai, doing business under the trade name UltraTek ("Plaintiff"), brought this action against defendants USB-Implementers Forum, Inc. ("USB-IF"), Foxconn International, Inc. and Foxconn Electronics, Inc. ("Foxconn") (collectively, "Defendants"), alleging causes of action for (1) Violation of Section 1 of the Sherman Antitrust Act, and (2) Intentional Interference With Prospective Economic Advantage. Plaintiff also named three other entities purportedly affiliated with Foxconn: Hon Hai Precision Industry Co., Ltd., Foxconn International Holdings Ltd., and Foxconn (Kunshan) Computer Connector Co. However, Defendants assert, and the docket reflects, that these entities have not yet been served. All of the Foxconn-affiliated defendants, served and unserved, will be referred to herein as the "Foxconn Defendants."

On November 21, 2014, the Court granted Defendants' motions to dismiss Plaintiff's initial Complaint on the ground that it failed to state a claim for relief pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). On December 11, 2014, Plaintiff filed his First Amended Complaint ("FAC"). In the FAC, the title of the second cause of action has been changed to "Intentional Interference With Prospective Economic Advantage and Contractual Relationships."

On January 5, 2015, Defendants filed the present Motions to Dismiss the FAC (the "Motions"), again pursuant to Rule 12(b)(6). For the following reasons, the Court **GRANTS** Defendants' Motions **without leave to amend**.

## II.     STATEMENT OF FACTS

The following facts are based upon Plaintiff's allegations. Plaintiff is engaged in the business of designing and manufacturing electronic components such as Universal Serial Bus ("USB") connectors, which are used primarily to connect computer peripherals to personal computers, smart phones, and other electronic devices. This connection is typically accomplished by plugging the "male" USB connector located on the computer peripherals into a "female" component which resides in the personal computers, smart phones, or other electronic devices. At issue is a "reversible" USB connector which Plaintiff markets under the name "Flipper USB." Unlike a standard "one-way" USB connector which must be plugged in to the female component with a particular side facing up, a "reversible" connector can be plugged in up or down. Plaintiff further specifies that Flipper USB is a "USB 2.0 Type A connector." Plaintiff owns a patent covering Flipper USB.

Plaintiff alleges that the three named-but-unserved Foxconn entities manufacture USB products, and that as a result, the Foxconn Defendants dominate the market for USB connectors in the U.S., possessing a market share greater than 50%. Also as a result, the Foxconn Defendants are the world's largest suppliers of USB connectors, and provide the USB connector components for approximately 50% of all computers and cell phones worldwide.[1]

Defendant USB-IF is a non-profit corporation which was formed in 1995 to provide a support organization and forum for the advancement and adoption of USB technology. USB-IF has over 700 member companies worldwide, including the Foxconn Defendants, and USB-IF's Board of Directors includes representatives from such companies as Intel Corporation, Hewlett-Packard Company, and Microsoft Corporation. Among other activities, USB-IF oversees and coordinates the development and adoption of technical standards for USB connectors. For this reason, it is often referred to as a "standard-setting organization." These standards comprise precise specifications for those products, which facilitates interoperability among device makers, computer makers, and others involved in developing and using USB connectors.

Additionally, USB-IF "certifies" USB connectors as compliant with the technical standards, though Plaintiff does not describe the certification process. Plaintiff alleges that USB-IF certification of a connecting device is essential to the commercial viability of that device; no manufacturer of a computer or similar device would buy or adopt a connector that has not been certified by USB-IF, nor is it possible to interest significant investors without such certification.

The USB-IF's Cables and Connectors Working Group ("CCWG") is responsible for the development and implementation of the technical standards. The Foxconn Defendants were prominent members of the CCWG "at the relevant time," and James Koser of Foxconn Electronics was the Chairman of the CCWG. Foxconn Defendant employees Tsuneki Watanabe and Jim Zhao were also members of that group.

Plaintiff alleges that on March 13, 2013, it made a written request to USB-IF "'to have our Flipper [Type A] connector officially certified by USB-IF.'" (FAC ¶ 48.) Plaintiff included in the

---

[1]Foxconn Electronics, Inc. ("Foxconn Electronics") does not appear to have any connection to USB products. It provides design and development, manufacturing, assembly, and after-sales services to computer, communication, and consumer-electronics companies in the United States and internationally. Plaintiff alleges on information and belief that Foxconn Electronics manufactures circuit boards, motherboards, graphic cards, chassis, coolers, and personal computers. Foxconn International, Inc. receives products from other Foxconn companies for distribution within the U.S.

request a link to the Flipper website which provides a picture, description, and data sheet for the device. The website also explains that Flipper:

> (1) is price competitive with current non-reversible USB 2.0 Type A plugs; (2) has built-in spare/back-up connections; (3) is 100% compatible with existing USB Type A one-way connector receptacles; (4) has multiple configurations available, e.g. surface mount 4 pin plug for portable electronic devices, USB flash drives, mouses, keyboards, mobile phones, USB hugs, and as cable connectors; (5) is patented; and (6) sets forth Flipper's performance and electrical specifications.

(*Id.*)

On that same day, at 12:02 p.m., Plaintiff received a response via email from Jeff Ravencraft of Intel, who is President and Chief Operating Officer of USB-IF as well as the chairperson of the USB-IF Marketing Committee. Mr. Ravencraft's email stated, "Regarding your wish/intention to have the 'Flipper' connector certified by the USB-IF, this type of connector solution is not certifiable by the USB-IF." (FAC ¶ 49.) Consequently, alleges Plaintiff, USB-IF refused to either test or certify the Flipper.

Plaintiff takes issue with this refusal because USB-IF allegedly had in place a testing and certification protocol for non-reversible USB 2.0 Type A Connectors; Plaintiff alleges that because Flipper is the "functional equivalent" of such a USB connector, it could have been tested and certified under that protocol. Plaintiff does not allege that USB-IF had in place a standard or protocol for testing or certifying reversible USB connectors, or that USB-IF has ever tested or certified such a connector.

Plaintiff further alleges that USB-IF's refusal was "expressly induced and persuaded by the Foxconn [D]efendants for the purpose of stifling competition from plaintiff's 'Flipper' . . . and keeping the marketplace completely open for the exploitation and sale of Foxconn's own competing USB connector products." (FAC ¶ 49.) In conjunction with this allegation, Plaintiff alleges on information and belief that Messrs. Koser, Watanabe, and Zhao, all of whom were part of the CCWG, have worked directly with Mr. Ravencraft, though Plaintiff does not allege where, when, or in what capacity. Elsewhere in the FAC, Plaintiff alleges that the Foxconn Defendants and USB-IF have "close ties," and that there are regular meetings in which USB-IF members, such as the Foxconn Defendants, meet with other members and USB-IF personnel.

Finally, Plaintiff alleges that as a result of Defendants' conduct, it has been kept out of the "multi-billion dollar" business for reversible USB 2.0 Type A connectors.[2] Plaintiff also alleges USB-IF's "refusal" to test and certify the Flipper USB "was a significant factor or cause" in the decision by Plaintiff's contract supplier, Tri-Net Technology, Inc. ("Tri-Net Technology"), to discontinue or reduce its production and sales of Plaintiff's product, as well as the decision by five prospective customers not to buy or produce Plaintiff's product.

## III.  JUDICIAL STANDARD

The federal pleading standard states in relevant part that "a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a party may move to dismiss for failure to state a claim upon which relief can be granted.

---

[2]Plaintiff states that it is currently selling a very limited amount of reversible Type A connectors that are not USB-IF certified.

In deciding a Rule 12(b)(6) motion, the court must assume allegations in the challenged complaint are true, and construe the complaint in the light most favorable to the non-moving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). However, the court need not accept as true conclusory legal allegations; "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]"). Furthermore, a pleading must contain sufficient factual matter that, if accepted as true, states a claim that is plausible on its face. *Iqbal*, 556 U.S. at 678. A claim is facially plausible when there are sufficient factual allegations to draw a reasonable inference that the defendant is liable for the misconduct alleged. *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

## IV.     DISCUSSION

Defendants argue that the FAC fails to state a cause of action for violation of Section 1 of the Sherman Antitrust Act ("Sherman Act") for four reasons: (1) Plaintiff does not allege a plausible agreement or conspiracy between USB-IF and the Foxconn Defendants, (2) Plaintiff does not otherwise allege conduct necessary to state a claim against a standard-setting organization, (3) Plaintiff has not adequately alleged an antitrust injury, and (4) Plaintiff does not sufficiently plead a relevant product market or Defendants' power within that market. Defendants also attack Plaintiff's cause of action for intentional interference with prospective economic advantage and contractual relationships.

### A.     Plausible Agreement or Conspiracy

Under Section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1. Plaintiff does not assert that the conduct at issue is *per se* illegal, but rather that the "rule of reason" test applies. (FAC ¶ 58.) "The rule of reason requires a claimant under Sherman Act § 1 initially to establish three elements: (1) an agreement or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually injures competition." *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507 (9th Cir. 1989) (internal quotation omitted). "After the claimant has established these elements, the factfinder must weigh the anticompetitive effects and the procompetitive effects or business justifications advanced for the challenged restraint to determine whether it is unreasonable." *Id.*

As with Plaintiff's original Complaint, the FAC fails to plausibly allege any agreement or conspiracy between USB-IF and the Foxconn Defendants. In place of its initial allegation that the Foxconn Defendants "expressly solicited" USB-IF's decision to refuse to allow the Flipper USB to be submitted or tested for certification, Plaintiff now alleges that the decision was "expressly induced and persuaded by" those defendants. (*Compare* Compl. ¶ 38 *with* FAC ¶ 49.) Yet this change in semantics fails to cure the deficiency in Plaintiff's pleading. As explained in the Court's prior order, "[a] plaintiff does not establish concerted action . . . merely by proving that [a] defendant sought agreement. More is required. The concept of a 'meeting of the minds' . . . means as well that evidence must be presented that" the other party "communicated its acquiescence or agreement . . . ." *Jeanery, Inc. v. James Jeans, Inc.*, 849 F.2d 1148, 1160 (9th Cir. 1988); *see also Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, 801 F. Supp. 2d 1163, 1192-95 (D.N.M. 2011) (allegations that member of standard-setting organization used its influence and stated its opposition to a draft standard were insufficient to plausibly allege an agreement). Here, again, Plaintiff fails to allege the requisite acquiescence or agreement.

Additionally, as with Plaintiff's initial Complaint, the FAC fails to satisfy the Ninth Circuit's requirement that allegations of a conspiracy or agreement "answer the basic questions: who, did what, to whom (or with whom), where, and when?" *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2007).[3] Plaintiffs have provided additional details regarding their request to have the Flipper officially certified by USB-IF, such as the date of the request and some information regarding its content. They have also identified the individual at USB-IF who responded to, and purportedly refused, their request. However, Plaintiff does not provide additional allegations regarding any conspiracy or agreement between USB-IF and the Foxconn Defendants which allegedly gave rise to the refusal. Plaintiff still does not allege which individuals entered into the purported conspiracy or agreement between those two entities, what the terms of the agreement were, or when or where it was formulated.

Plaintiff's Oppositions ignore the Court's prior decision and again maintain that the "what" and "when" are Mr. Ravencraft's March 13, 2013 refusal. Yet, as the Court previously explained, this allegation says nothing about any agreement between USB-IF and the Foxconn Defendants. Also as in its prior oppositions, Plaintiff asserts that Messrs. Koser, Watanabe, and Zhao, along with Mr. Ravencraft, are the "who." However, the FAC's allegations regarding those individuals largely mirror those of the Complaint. The FAC's primary allegation is that Messrs. Koser, Watanabe, and Zhao were members of the CCWG. It adds that they worked "directly" with Mr. Ravencraft at some unspecified time and place, in an unspecified capacity. The FAC does not allege that these four individuals entered into any conspiracy or agreement.

Rather than point to alleged facts which support Plaintiff's claim, the Oppositions indicate that the claim is based on nothing more than speculation. Plaintiff's primary example of facts "evidencing a conspiracy or agreement" is as follows:

> [D]espite the wide range of potential procompetitive benefits of standardizing reversible USB connectors, the world's largest supplier of USB devices (Foxconn), and the global standard-setting organizing for USB standards (USB-IF) excluded UltraTek's patented product from testing and certification for no apparent legitimate reason. . . . If the goal of the standardization process is to ultimately reduce costs, increase manufacturing and output, and encourage compatibility and innovation, why would USB-IF seek to suppress USB-IF's new and inventive product from the market if not to preserve the market for Foxconn, its most influential committee member?

(Pl.'s Opp'n to Foxconn's Mot. 9:13-26.)

In other words, Plaintiff points to USB-IF's "rejection" of its request, and then jumps to the conclusion that it *must* have been the product of some sort of conspiracy or agreement between USB-IF and the Foxconn Defendants, because, Plaintiff asserts, that is the only explanation that makes sense. Yet after the Court provided guidance in its prior order and allowed Plaintiff leave to amend its complaint, Plaintiff still has not alleged a single fact showing this is what actually happened. Such "'naked assertions' devoid of 'further factual enhancement'" do not suffice. *Iqbal*, 556 U.S. at 678.

Further, these pleading deficiencies cannot be remedied by the allegation that "defendants have engaged in a contract, concerted conduct, combination or conspiracy" (FAC ¶ 43), as this is nothing

---

[3]Plaintiff once again argues that these details are "generally not required in an antitrust case," and attempts to distinguish *Kendall*. (*See* Pl.'s Opp'n to Foxconn's Mot. 10:5-7, n.2.) The Court already considered and addressed this argument in its prior opinion. (*See* ECF No. 30 at 4.)

more than a "legal conclusion[ ] resting on the prior allegations." *Kendall*, 518 F.3d at 1047. Because Plaintiff again "fail[s] to plead the necessary evidentiary facts to support th[is] conclusion[,]" *id.* at 1048, the FAC's allegations "stop[ ] short of the line between possibility and plausibility of entitle[ment] to relief." *Twombly*, 550 U.S. at 557.

### B. Allegations of "Manipulating" the Standard-Setting Process

Plaintiff also appears to assert that even in the absence of a conspiracy or agreement with the Foxconn Defendants, USB-IF is liable because it acted to "manipulate" or "subvert" the standard-setting process. Yet Plaintiff's argument under this theory hinges largely on alleged "concerted" action along with the Foxconn Defendants. (*See* Pl.'s Opp'n to USB-IF's Mot. 7:21-8:12.)

Courts have recognized that "a trade association by its nature involves collective action by competitors," but have found that "a trade association is not by its nature a 'walking conspiracy,' its every denial of some benefit amounting to an unreasonable restraint of trade." *See Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293-94 (5th Cir. 1988). "[T]he failure of a private, standard-setting body to certify a product is not, by itself, a violation of § 1." *Greater Rockford Energy and Tech. Corp. v. Shell Oil Corp.*, 998 F.2d 391, 396 (7th Cir. 1993). Rather, "'[t]o state a claim against a standard-making organization . . . [a claimant] must show either that it was barred from obtaining approval of its products on a discriminatory basis from its competitors, or that the conduct as a whole was manifestly anticompetitive and unreasonable.'" *In re Circuit Breaker Litig.*, 984 F. Supp. 1267, 1278 (C.D. Cal. 1997) (quoting *ECOS Elecs. Corp. v. Underwriters Labs.*, 743 F.2d 498, 501 (7th Cir. 1984)) (internal quotation marks omitted).

Here, the FAC fails to make the requisite showing. First, Plaintiff fails to allege that it was barred from obtaining certification of its Flipper product on a discriminatory basis from its competitors. Plaintiff does not allege that USB-IF ever certified any reversible USB connector under its standard for non-reversible USB connectors. Moreover, while Plaintiff alleges that the Flipper USB was the "functional equivalent" of a non-reversible USB 2.0 Type A connector for certification purposes, Plaintiff does not allege that the characteristics of its Flipper USB are similar to those of any non-reversible USB connectors which were in fact certified.

Additionally, Plaintiff fails to plausibly allege that USB-IF's conduct was "manifestly anticompetitive and unreasonable." Excluding conclusory statements, the salient facts pertaining to USB-IF are that: (1) USB-IF has a standard in place for certifying non-reversible USB 2.0 Type A connectors; (2) on March 13, 2013, Plaintiff made a written request to USB-IF to have the Flipper, a reversible USB 2.0 Type A connector, officially certified, and included a link to a website with information about that product, (3) and within a matter of hours, President and COO Mr. Ravencraft, of Intel, responded via email that "this type of connector solution is not certifiable by the USB-IF." The primary thrust of these allegations is that USB-IF informed Plaintiff that its reversible USB connector was not certifiable under USB-IF's standard for *non*-reversible USB connectors. This is insufficient.

Further, even assuming "concerted" action along with the Foxconn Defendants would suffice in the absence of an actual agreement or conspiracy, the allegations regarding such conduct, addressed in the preceding section, are not enough to nudge the FAC across "the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678. In fact, Plaintiff's allegation of an "anticompetitive scheme" by the Foxconn Defendants giving rise to "concerted conduct" between those defendants and USB-IF appears distinctly implausible given that Mr. Ravencraft's email was sent at 12:02 p.m. on the same day Plaintiff sent its request.

Plaintiff relies heavily on *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corporation*, 456 U.S. 556 (1982) ("*ASME*"), asserting that the FAC's allegations are "nearly identical"

to those in *ASME*. Plaintiff's reliance is misplaced for two reasons. First, the Court in *ASME* did not address or apply any test for stating a claim against a standard-making organization. It accepted the jury's finding that the organization's agents were liable, and the question before the Court was solely whether the organization, ASME, could also be held liable on the theory that its agents had acted within the scope of their apparent authority. *Id.* at 565.

Second, *ASME*'s facts are distinguishable. In that case, there was clear evidence that an employee of a member company, M&M, manipulated ASME's procedures with the goal of thwarting a challenge from a competitor. That employee, James, drafted a letter to an ASME committee inquiring about the interpretation of a particular code provision, and submitted it under a different name. Pursuant to ASME procedures, that letter was referred to a subcommittee of which James was the vice chairman. James then drafted a response to the very letter he submitted, interpreting the code provision in a manner which was harmful to M&M's competitor. *Id.* at 559-564. Here, in contrast, Plaintiff does not allege any facts showing that any of the Foxconn Defendants' employees abused USB-IF's procedures to harm Plaintiff.

### C. Antitrust Injury

Defendants further assert that Plaintiff has failed a second time to adequately allege an "antitrust injury," "which is to say injury of the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). As courts have long held, "[t]he antitrust laws 'were enacted for the protection of *competition*, not *competitors*,'" and a plaintiff must therefore "demonstrate injury to competition in the market as a whole, not merely injury to itself as a competitor." *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1024-25 (9th Cir. 2013) (quoting *Brunswick*, 429 U.S. at 488) (emphasis in original). "Only when the restraining force of an agreement or other arrangement affecting trade becomes unreasonably disruptive of market functions such as price setting, resource allocation, market entry, or output designation is a violation of the Sherman Act threatened." *Les Shockley*, 884 F.2d at 508. Further, a claimant "may not merely recite the bare legal conclusion that competition has been restrained unreasonably. Rather, a claimant must, at a minimum, sketch the outline of the antitrust violation with allegations of supporting factual detail." *Id.* at 507-08.

Despite the Court's prior order finding that Plaintiff's initial Complaint did not sufficiently allege an antitrust injury, the FAC contains only minimal changes. Plaintiff again alleges that as a result of the actions which have "kept plaintiff out" of the market for reversible USB 2.0 Type A connectors, "[h]undreds of millions of people are affected and will continue to be frustrated." (FAC ¶ 51.) Plaintiff also again alleges that "output has been limited and the quality and choice for USB connector products has been reduced and diminished in that market." (*Id.* at ¶ 56.) While "convergence of injury to a market competitor and injury to competition is possible when the relevant market is both narrow and discrete and the market participants are few[,] . . . none of the factual allegations in [the FAC] suggests a market in which removal of [plaintiff] from the pool of competing sellers would adversely and unreasonably affect overall competitive conditions." *Les Shockley*, 884 F.2d at 508-09. To the contrary, Plaintiff alleges that the reversible USB 2.0 Type A connector market is a "multi-billion dollar business" involving "195 million tablets sold in 2013, [and] 500 million other USB devices also sold[.]" (FAC ¶ 51.) Given the enormity of the market in which Plaintiff competes, the allegations once more fail to show that overall competitive conditions have been affected by the failure to certify one product manufactured by a single competitor.

Additionally, the above allegations of injury, as well as the others contained in the FAC, do not contain the requisite "supporting factual detail." For example, the FAC contains allegations that "competition in the development of USB 2.0 Type A connectors has been substantially and unreasonably restricted, lessened, foreclosed and eliminated," and that "barriers to entry in the market

have been raised." (FAC ¶ 59(d)-(e).) These are "bare legal conclusions" untethered from supporting facts.

Plaintiff's only substantively new allegation is that USB-IF's "refusal" to test and certify the Flipper USB "was a significant factor or cause" in the decision by Plaintiff's contract supplier, Tri-Net Technology, to discontinue or reduce its production and sales of Plaintiff's product, as well as the decision by five prospective customers not to buy or produce Plaintiff's product. (FAC ¶ 60.) Yet these are also fundamentally injuries to Plaintiff's own business, rather than to overall competitive conditions. Thus, this allegation fails to cure the aforementioned deficiencies.

Because the Court has found that the FAC does not allege (1) a plausible agreement or conspiracy between USB-IF and the Foxconn Defendants, (2) other conduct necessary to state a claim against a standard-setting organization, or (3) an antitrust injury, the Court need not address whether Plaintiff has sufficiently pled a relevant product market or Defendants' power within that market.[4] Defendants' Motion to Dismiss is **granted** as to Plaintiff's claim for violation of Section 1 of the Sherman Act.

### D. Intentional Interference With Prospective Economic Advantage and Contractual Relationships

Plaintiff's second claim appears to conflate two distinct California state law torts: (1) intentional interference with prospective economic advantage; and (2) intentional interference with contractual relations.

The elements of intentional interference with prospective economic advantage are: (1) an economic relationship between the plaintiff and a third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003). Additionally, the defendant's conduct must be "wrongful by some legal measure other than the fact of interference itself." *Id.* This tort pertains to interference with Plaintiff's alleged negotiations with five prospective customers. (FAC ¶ 66.)

The elements of intentional inference with contractual relations are: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990). This tort pertains to interference with Plaintiff's alleged contractual relationship with Tri-Net Technology. (FAC ¶ 66.)

With regard to interference with prospective economic advantage, Plaintiff's allegation that Defendants' conduct was "independently wrongful" hinges upon its claim that Defendants' conduct violated Section 1 of the Sherman Act. (*See* Pl.'s Opp to USB-IF's Mot. 20:13-15; Pl.'s Opp to Foxconn's Mot. 20:12-14.) Because the Court finds that the FAC does not sufficiently state a claim for violation of Section 1 of the Sherman Act, Plaintiff's allegation regarding independently wrongful conduct necessarily fails.

Additionally, as to both torts, Plaintiff fails to sufficiently allege intentional acts designed to

---

[4]The FAC changed the definition of the alleged product market from "reversible USB connectors" to "USB 2.0 Type A connectors." (*Compare* Compl. ¶ 36 *with* FAC ¶¶ 18, 45.)

disrupt the economic relations or contract at issue. The "intentional acts" forming the basis for these torts is the "concerted conduct" allegedly resulting in USB-IF's "refusal" to certify the Flipper USB, which formed the basis for Plaintiff's Sherman Act claim. (*See* FAC ¶ 66 (identifying "defendants' concerted conduct" as the act at issue).) As discussed in Sections IV(A) and (B), *supra*, Plaintiff failed to allege sufficient facts to plausibly show such concerted conduct resulting in USB-IF's refusal.

Finally, Plaintiff pleads Defendants' knowledge of the relationships and contract in conclusory fashion, simply alleging that "Defendants were aware of these prospective business and actual contractual relationships . . . ." (FAC ¶ 68.) The Ninth Circuit has found such conclusory allegations insufficient. *See Capitol W. Appraisals LLC v. Countrywide Fin. Corp.*, 467 F. App'x 738, 739 (9th Cir. 2012) ("The SAC merely states that Countrywide had knowledge of economic relationships between Capitol West and mortgage brokers and lenders without any further specific allegations. These conclusory statements are not entitled to the presumption of truth, and are insufficient to plead Countrywide's knowledge.").

Therefore, Plaintiff's allegations that Defendants violated these two California state law torts are insufficient, and the Court **grants** Defendants' Motion to Dismiss as to those claims.

### E.  Leave to Amend

The Court's prior order addressed the defects in Plaintiff's initial Complaint at length. However, the FAC failed to allege sufficient facts to cure those defects. In many instances, Plaintiff appears to have ignored the prior order's analysis of the issues. Since Plaintiff has failed to state a claim after guidance and an opportunity to amend, it appears to the Court that further amendment would "constitute[ ] an exercise in futility." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989) (noting further that "[t]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint."). Therefore, the Court grants Defendants' Motions to Dismiss **without leave to amend**. *See Smilecare Dental Grp. v. Delta Dental Plan of Cal.*, 858 F. Supp. 1035, 1041-42 (C.D. Cal. 1994) (dismissing antitrust complaint with prejudice where plaintiff was unable to allege anticompetitive conduct after guidance and one opportunity to amend its complaint).

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motions to Dismiss **without leave to amend**.

**IT IS SO ORDERED.**

:

**Initials of Preparer**